T.C. Memo. 2017-74

UNITED STATES TAX COURT

CHRISTOPHER R. COOKE, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18735-15.                     Filed May 1, 2017.

<u>Charles F. Schuetze</u>, for petitioner.

<u>Gregory M. Hahn</u>, <u>Kathryn A. Meyer</u>, <u>Nick G. Nilan</u>, and <u>William D. Richard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined deficiencies of $42,606 and $38,157 in petitioner's Federal income tax for 2010 and 2011, respectively. Respondent also determined accuracy-related penalties under section 6662(a) of $8,418 and $7,631 for 2010 and 2011, respectively.

**[*2]** After concessions,[1] the issues for consideration are: (1) whether petitioner's claimed deductions for passthrough losses from Legend of French Lick, L.L.C. (French Lick), for 2010 and 2011 are limited by section 280A; and if not, whether those deductions are limited by the passive loss rules of section 469; and (2) whether petitioner is liable for the accuracy-related penalties under section 6662(a).

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Alaska when he timely filed his petition.

---

[1]Petitioner conceded the deductions pertaining to his property in Bethel, Alaska.

**[*3]** Petitioner's Background

Petitioner is an attorney. During the tax years in issue he was a partner in his law firm and practiced out of offices in Anchorage and Bethel, Alaska. During the tax years in issue he owned interests in rental real estate.

Petitioner owned a 50% membership interest in French Lick, a limited liability company that elected to be taxed as a partnership for Federal income tax purposes. French Lick owned a property in West Baden Springs, Indiana (Indiana property).

Indiana Property

In May 2007 petitioner and his domestic partner traveled to Cincinnati, Ohio, for petitioner's high school reunion. During this trip they visited the area surrounding French Lick, Indiana. They met with a local real estate agent who recommended that they take a tour of the Indiana property, a house and adjacent property in West Baden Springs. The Indiana property was the former home of NBA basketball star Larry Bird.

During the May 2007 trip petitioner and his domestic partner toured the Indiana property. They believed that it could be converted successfully into a bed and breakfast. In June 2007 they sought and received advice from a local rental

[*4] property manager about the viability of operating the Indiana property as a bed and breakfast in the French Lick area.

On August 29, 2007, French Lick was formed under the laws of the State of Indiana. Petitioner and his domestic partner were its sole members and managers. In September 2007 French Lick purchased the Indiana property for $787,500. On September 20, 2007, petitioner and his domestic partner executed the operating agreement for French Lick. It provided that petitioner and his domestic partner each held a 50% membership interest and that profits and losses generally were to be shared between them in accordance with their respective interests.

During 2007 and 2008 improvements were made to the Indiana property in order to convert it into a bed and breakfast. About June 1, 2008, French Lick began operating the Indiana property as a bed and breakfast. Between May 2008 and January 2010 French Lick employed a series of managers for the bed and breakfast at the Indiana property. French Lick's contracts with the managers provided them with an apartment on the Indiana property to use as their personal residence. The last manager of the bed and breakfast resigned in January 2010, and a replacement manager was not hired.

French Lick reported gross income from the bed and breakfast operation of $10,939, $29,971, and $497 for 2008, 2009, and 2010, respectively. In September

**[*5]** 2009 French Lick listed the Indiana property for sale at $1,950,000.[2] As of January 31, 2010, French Lick discontinued the bed and breakfast operation at the Indiana property and no longer accepted lodgers after that date.

During the tax years in issue caretakers resided at the Indiana property. The first caretaker resided at the property during 2010. The second resided at the property from January 2011 through the end of the year. French Lick gave the caretakers rent-free use of the manager's apartment in exchange for their services as caretakers of the Indiana property.

Following the discontinuation of the bed and breakfast operation, from February 2010 through December 2011 no rental activity occurred at the Indiana property. During the time that the Indiana property was listed for sale, petitioner received several inquiries from parties wanting to rent it, including offers to rent the garage. Petitioner declined these offers for various reasons, including that the revenues generated would not justify the related expense. He also had concerns about supervision and liability, and he believed that some of the proposed uses were incompatible with the nature of the Indiana property and his desire to hold it available as a bed and breakfast.

---

[2]In December 2014 French Lick sold the Indiana property for $500,000.

**[\*6]** <u>Expenses Associated With the Indiana Property During the Tax Years in Issue</u>

During the tax years in issue French Lick maintained a business checking account at Wells Fargo and a Visa business credit card with Bank of America. Petitioner paid the expenses associated with the management and maintenance of the Indiana property, including balances incurred on the business credit card, from French Lick's business checking account. Petitioner maintained QuickBooks records for French Lick, which reflected the expenses incurred in connection with the Indiana property. Petitioner used QuickBooks to reconcile periodically the payments made from French Lick's business checking account and the charges made on the business credit card.

During the tax years in issue French Lick paid expenses for advertising, insurance, real property taxes, accounting and bookkeeping services, repair and maintenance services, landscaping services, telephone and cable TV services, and utilities. Petitioner also recorded in the QuickBooks records for French Lick expenses for travel and entertainment, including expenses for meals, transportation, and lodging.

[*7] <u>Trips to the Indiana Property</u>

During the tax years in issue petitioner made several trips to the Indiana property while the property was listed for sale. Petitioner's domestic partner accompanied him on most of these trips. For most nights during the trips they stayed in one of the guest suites at the Indiana property.

Petitioner kept records of the airline tickets and car rentals that he purchased for his and his domestic partner's travel to and from the Indiana property. He kept receipts of purchases that he made during his trips to the Indiana property, including receipts for meals, gas, and hardware and grocery store purchases. He did not keep contemporaneous logbooks of his activities at the Indiana property.

<u>2010 Trips</u>

In 2010 petitioner made three trips to the Indiana property. He was there for at least a part of 26 days.

Petitioner's first trip lasted eight days, and he was at the Indiana property on seven of them. Petitioner's domestic partner accompanied him during this trip. On the first day petitioner traveled from Anchorage, and he did not arrive at the Indiana property until the early morning of the second day. During this trip petitioner visited the Horseshoe Resort and Casino (Horseshoe Resort) for two days, including one night. The Horseshoe Resort was in Elizabeth, Indiana, near

[*8] Louisville, Kentucky.  On the last day petitioner left the Indiana property in the morning and traveled back to Anchorage.

Petitioner's second trip lasted 11 days, and he was at the Indiana property on 10 of them.  His domestic partner accompanied him.  On the first day petitioner traveled, and he arrived in the early morning of the second day.  During this trip he spent two days in the Louisville area, including one night at the Horseshoe Resort.  On the last day petitioner traveled back to Anchorage.

Petitioner's third trip lasted 11 days and he was at the Indiana property on 9 of them.  His domestic partner accompanied him.  On the first day petitioner traveled, and he arrived in the early morning of the second day.  During this trip petitioner visited the Louisville area for three days, including two nights at the Horseshoe Resort.  On the last day he traveled back to Anchorage.

2011 Trips

In 2011 petitioner made four trips to the Indiana property.  Petitioner was at the property for at least a part of 33 days.

Petitioner's first trip lasted 12 days, and he was at the Indiana property on 10 days.[3]  Petitioner's domestic partner accompanied him for a part of this trip.

---

[3]We do not count a day in which petitioner left the Indiana property shortly after midnight following a full day at the property.

[*9] Petitioner spent the first and last days traveling, and he was not at the Indiana property. On the second day petitioner arrived at the Indiana property in the late afternoon. During this trip petitioner spent two days visiting the Louisville area, including one night at the Horseshoe Resort. Petitioner left the Indiana property around midnight following the 11th day.

Petitioner's second trip lasted 12 days, and he was at the Indiana property on 10 of them. His domestic partner accompanied him. On the first day petitioner traveled and was not at the Indiana property. He arrived at the Indiana property in the evening of the second day. During this trip petitioner went to the Horseshoe Resort for three days, including two nights. On the last day he left the Indiana property in the morning.

Petitioner's third trip lasted seven days, and he was at the Indiana property on four of them. The first day was spent traveling. On the second day petitioner arrived at the Indiana property in the late afternoon. During this trip petitioner went to Cincinnati for his 50th high school reunion and spent three days in Cincinnati, including two nights. On the last day he traveled from Cincinnati back to Anchorage.

Petitioner's fourth trip lasted 13 days, and he was at the Indiana property on 9 of them. His domestic partner accompanied him. This trip coincided with the

[*10] Labor Day holiday weekend. Petitioner spent the first and last days traveling, and was not at the Indiana property. On the second day he traveled and arrived at the property in the evening. During this trip petitioner spent four days in the Louisville area, including three nights at the Horseshoe Resort. He left the Indiana property shortly after midnight following the 12th day.

Tax Returns

French Lick's Losses for the Tax Years in Issue

French Lick filed Forms 1065, U.S. Return of Partnership Income (partnership returns), for the tax years in issue.[4] The partnership returns reported ordinary business losses for the tax years in issue of $134,273 and $127,740, respectively. For both of the tax years in issue French Lick claimed deductions for repairs and maintenance, taxes and licenses, depreciation, and "other deductions". Statements attached to the partnership returns described the claimed "other deductions", including deductions for advertising, insurance, utilities, telephone and TV, accounting, security services, linens and lodging supplies, auto expenses, travel, and meals and entertainment.

---

[4]French Lick is not an entity subject to the TEFRA partnership audit rules. See sec. 6231(a)(1)(B) (French Lick had 10 or fewer members who were all U.S. persons during the tax years in issue).

**[\*11]**  Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., that French Lick issued for the tax years in issue allocated 100% of the tax attributes of French Lick, including all profits and losses, to petitioner.

Petitioner's Tax Returns

Petitioner filed timely Forms 1040, U.S. Individual Income Tax Return, for the tax years in issue.  He reported 100% of French Lick's losses as nonpassive losses on Part II, Income or Loss From Partnerships and S Corporations, of Schedules E, Supplemental Income and Loss.  He deducted French Lick's losses against other nonpassive income that he reported on the Schedules E, Part II.

OPINION

I.    Burden of Proof

Generally, the taxpayer bears the burden of proving that the adjustments set forth in the Commissioner's notice of deficiency are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Specifically, the taxpayer must prove his or her entitlement to claimed deductions.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  The taxpayer bears the burden of maintaining the records needed to establish his or her entitlement.  See sec. 6001; Hradesky v. Commissioner, 65 T.C. 87 (1975), aff'd, 540 F.2d 821 (5th Cir. 1976).

[*12] Section 7491(a)(1) provides that if a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability, the Commissioner shall have the burden of proof with respect to that issue. See Higbee v. Commissioner, 116 T.C. 438, 442-443 (2001). Petitioner contends that the burden should shift to respondent with respect to whether the deductions that he claimed for losses from the Indiana property are limited by section 280A and, alternatively, whether the deductions are limited by section 469. Petitioner failed to provide credible evidence of repair and maintenance activities conducted during his trips to the Indiana property during the tax years in issue. Petitioner failed to argue persuasively that the burden shifts to respondent. The burden of proof remains with petitioner.

II.    Disallowed Deductions

Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 212(1) and (2) allows a deduction for ordinary and necessary expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. With respect to either section, no deductions are allowed for expenses incurred in connection with activities that are not engaged in

**[\*13]** for profit. See sec. 183(a); sec. 1.183-2(a), Income Tax Regs. Generally, a taxpayer may not deduct personal, living, or family expenses. Sec. 262(a).

Under section 280A(a) generally no deduction is allowed with respect to any dwelling unit that the taxpayer uses as a residence during the taxable year. See Langley v. Commissioner, T.C. Memo. 2013-22, at \*5. Any deductions to which petitioner would otherwise be entitled under either section 162 or section 212 will be disallowed if he used the Indiana property as a residence during the tax years in issue within the meaning of section 280A(d)(1). A dwelling unit is used as a residence if the taxpayer uses it for personal purposes for more than the greater of 14 days or 10% of the number of days during the taxable year that the unit is rented at a fair rental value. Sec. 280A(d)(1).[5] A passthrough entity is considered to have made personal use of a dwelling unit on any day on which any beneficial owner would be considered to have made personal use of the unit. See Holmes v. United States, 85 F.3d 956 (2d Cir. 1996).

If a taxpayer uses a dwelling unit for personal purposes for any part of a day, generally that day is counted as one of personal use for determining whether

---

[5]The bed and breakfast closed on January 31, 2010, and gross receipts for 2010 were $497. The record does not indicate the actual number of days that the Indiana property was rented in 2010. Even if it was rented for the whole month of January, the applicable personal use limitation under sec. 280(d)(1) would be 14 days.

[*14] the taxpayer used the unit as a residence during the taxable year. Sec. 280A(d)(2). Pursuant to section 280A(d)(2) (flush language), if the taxpayer is engaged in repairs and maintenance of the dwelling unit substantially full time on any day, such use will not constitute personal use of the unit. See also Twohey v. Commissioner, T.C. Memo. 1993-547.

Section 1.280A-1(e)(6), Proposed Income Tax Regs., 48 Fed. Reg. 33323 (July 21, 1983), states that "a dwelling unit shall not be deemed to have been used by the taxpayer for personal purposes on any day on which the principal purpose of the use of the unit is to perform repair or maintenance work on the unit." The proposed regulation sets forth a "facts and circumstances" test to determine the taxpayer's principal purpose for the use of the unit. See id. The facts and circumstances include, but are not limited to, the amount of time devoted to repair and maintenance work, the frequency of use for repair and maintenance work, and the presence and activity of companions. See id.

Proposed regulations are not binding on this Court and are generally given no greater weight than a litigation position. See Canterbury v. Commissioner, 99 T.C. 223, 246 n.18 (1992); F.W. Woolworth Co. v. Commissioner, 54 T.C. 1233, 1265-1266 (1970). Nevertheless, they can be useful guidelines where, as here,

**[*15]** they closely follow the legislative history of the statutory provision in question.  See Seawright v. Commissioner, 117 T.C. 294, 300 (2001).

Congress enacted section 280A in response to the "concern that rental of property used by the taxpayer as a residence afforded the taxpayer unwarranted opportunities to obtain deductions for expenses of a personal nature."  Bolton v. Commissioner, 77 T.C. 104, 107-108 (1981) (citing H.R. Rept. 94-1515, 94th Cong., 2d Sess. 436 (1976), S. Rept. 94-938, 94th Cong., 2d Sess. 150-152 (1976), and H.R. Rept. 94-658, 94th Cong., 1st Sess. 162-164 (1975)), aff'd, 694 F.2d 556 (9th Cir. 1982).  However, the wording of the statute demonstrates that Congress did not intend for days spent primarily repairing and maintaining the property in question to count as personal use days.  See sec. 280A(d)(2) (flush language).  Likewise, a day spent traveling to or from the property, on which the taxpayer is at the property but performs no repairs and maintenance, should not be counted as a day of personal use if the principal purpose of the trip as a whole is to perform repairs and maintenance.  See sec. 1.280A-1(e)(6) and (7), Example (3), Proposed Income Tax Regs., supra.

[*16]  The record establishes that petitioner was at the Indiana property for at least a part of each of 26 days in 2010 and 33 days in 2011.[6]  Petitioner testified that he spent numerous hours on "business activities" during each of his trips to the Indiana property.  He relied on daily activity logs (logbooks) that he created during examination.  We must determine the number of days that petitioner used the Indiana property for personal purposes and the number of days that petitioner performed repairs and maintenance substantially full time.

Petitioner contends that he "engaged substantially full time in maintenance and repair activities during every day * * * [he] spent at the Property in 2010 and all except for possibly two days in 2011."  Petitioner contends that the days that he spent traveling from and back to Anchorage should not be counted as personal use days of the Indiana property because the principal purpose of each trip during the tax years in issue was to perform repairs and maintenance.  Petitioner also argues that any days that he spent visiting the Louisville area should not count as personal use days because on these days he "travel[ed]" to spend "time away from the

_____

[6]Petitioner's first trip in 2010 included some days during which the bed and breakfast was still operating.  Sec. 280A(f)(1)(B) does not apply for these days on which petitioner was at the Indiana property because the property was not being used exclusively as an inn.

[*17] owned premises" and the principal purpose of his time spent at the Indiana property was otherwise to perform repairs and maintenance.

Petitioner relies on his logbooks to establish that he engaged in repair and maintenance activities during his trips to the Indiana property. His testimony did not provide specific details about the activities that he performed. He testified that he did some work on the grounds of the Indiana property. No other witnesses testified to verify that petitioner conducted repairs and maintenance during his trips to the Indiana property.

From petitioner's testimony and the logbooks, there is no evidence of disrepair of the Indiana property and no specific details of what was to done to improve it. Cf. Twohey v. Commissioner, T.C. Memo. 1993-547 (taxpayers documented the extent and necessity of their work). After January 2010 French Lick did not rent out the Indiana property during the tax years in issue. Aside from petitioner's own visits, there was no specific use for which to repair and maintain the property.

During the tax years in issue a series of caretakers lived at the Indiana property. Petitioner's records indicate that these caretakers had duties and responsibilities with respect to maintaining the property and that he had conversations with the caretakers about the status and upkeep of the property at

[*18] least once per month. The logbooks report that during his trips petitioner engaged in activities maintaining the grounds of the Indiana property. However, the records that petitioner maintained for French Lick show that French Lick employed a landscaping firm during the tax years in issue. Petitioner's records show that landscaping services were performed at the Indiana property every month from May through December 2010, as well as March and May through December 2011.

Petitioner testified that he reconstructed the "business activity" summaries in the logbooks by reviewing the records and receipts that he maintained for each of his trips to the Indiana property and the QuickBooks records for French Lick, which also reflected purchases made during those trips. Petitioner testified that these records "helped refresh * * * [his] more general recollection of the kinds of activities that * * * [he] did on the property." We find that petitioner's records generally do not substantiate that he performed the activities reported in the logbooks. For many of the days that petitioner was at the Indiana property these records do not establish that he engaged in repairs and maintenance of any kind. Petitioner has not adequately explained how on the basis of these records alone he was able to reconstruct the long lists of "business activities" shown for most days in the logbooks.

[*19]  The "business activity" summaries provided for each day of petitioner's trips to the Indiana property do not explain how many hours he spent on each individual activity.  The summaries frequently combine activities that constitute "repairs and maintenance" within the meaning of section 280A(d)(2) with activities that we conclude do not.  Repair and maintenance activity that excepts a taxpayer's use of a dwelling unit from being personal use under section 280A(d)(2) should be some activity related to repairing or maintaining the dwelling unit itself or the property on which it sits.  Our prior cases support and are consistent with this interpretation of the statute.  See Twohey v. Commissioner, T.C. Memo. 1993-547.

For many of the days that petitioner was at the Indiana property his "business activity" summaries include activities such as traveling to visit with past vendors and business contacts, meetings with the resident caretaker and other service providers for the property, and discussions with the local real estate agent.  These activities may constitute business activity under other Code sections, but they are not the repairs and maintenance contemplated by section 280A(d)(2).  The logbooks do not provide sufficient information for the Court to determine how much time petitioner spent on repairs and maintenance versus other activities that do not except his use of the property from use "for personal purposes" under

[*20] section 280A(a). Even when petitioner's records appear to corroborate a specific repair or maintenance activity on a specific day reported in the logbooks, we cannot determine whether petitioner's time spent on such repairs and maintenance on that day amounted to engagement on a substantially full time basis.

Petitioner failed to establish that he engaged in repairs and maintenance substantially full time on any of the days that he was present at the Indiana property. Petitioner failed likewise to establish that the primary purpose of any of his trips was to perform repairs and maintenance on the property, and so none of the days on which he traveled and was present at the property should be excluded from days of personal use. All of petitioner's trips except for one included trips to the Horseshoe Resort.

Petitioner has not met his burden of proof, and we conclude that he used the Indiana property for personal purposes for more than 14 days during each of 2010 and 2011. The deductions that petitioner claimed for losses allocated to him from French Lick for the tax years in issue are disallowed pursuant to section 280A(a).[7] Therefore, we do not address whether the deductions would have been limited

---

[7]We do not need to decide whether the losses were properly allocated, since any passthrough losses from French Lick are not deductible under sec. 280A.

[*21] under section 469.  See sec. 469(j)(10) (regarding the coordination of section 469 and section 280A).

III.    Accuracy-Related Penalties

Respondent contends that for each tax year in issue petitioner is liable for an accuracy-related penalty pursuant to section 6662(a).  Section 6662(a) imposes a 20% penalty on any underpayment of tax attributable to, among other things, negligence or disregard of rules or regulations within the meaning of subsection (b)(1), or any substantial understatement of income tax within the meaning of subsection (b)(2).  Respondent argues that petitioner had an underpayment attributable to a substantial understatement of income tax for 2010 and that petitioner's underpayments for both tax years in issue were due to negligence.  Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.

The Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty.  Sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446.  Once the Commissioner has met the burden of production, the burden of proof

**[*22]** remains with the taxpayer, including the burden of proving that the penalty is inappropriate. Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447.

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, to exercise due care, or to do what a reasonable and prudent person would do under the circumstances. Sec. 6662(c); Neely v. Commissioner, 85 T.C. 934, 947 (1985); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence also includes any failure by a taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. Respondent has demonstrated that petitioner failed to keep adequate records with respect to deductions that he claimed for the tax years in issue.

The section 6662(a) penalty does not apply with respect to any portion of the underpayment for which it is shown that the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1). The decision as to whether a taxpayer acted with reasonable cause and in good faith is made by taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Relevant factors include the taxpayer's efforts to assess his or her proper tax liability, including the taxpayer's reasonable and good-faith reliance on the advice of a tax professional. See id.; see also sec. 1.6664-4(c), Income Tax Regs. To

[*23] establish good faith and reasonable cause through reliance on professional advice, the taxpayer must prove by a preponderance of the evidence that (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioner contends that he acted with reasonable cause and in good faith and that he relied on the advice of his C.P.A. Petitioner testified that he consulted with his C.P.A. sometime following the renovations to the Indiana property. Petitioner testified that "the main focus would have been how do we account for the expenses or who reports the business activity * * * for purposes of offsetting the expenses with income."

Petitioner offered no evidence regarding the C.P.A.'s competence as a tax professional or regarding the information that petitioner provided the C.P.A. before receiving his advice. Petitioner did not establish that the C.P.A. was provided with all necessary and accurate information needed to advise petitioner in a manner that would have justified his purported reliance. Petitioner has not carried his burden of proving that he acted with reasonable cause and in

**[*24]** good faith with respect to the deductions that he claimed in relation to the Indiana property.

Petitioner is liable for the accuracy-related penalties determined by respondent under section 6662(a) for the tax years in issue. Because petitioner is liable for the penalty for 2010 on the ground of negligence, we do not address whether petitioner's understatement of income tax for that year was substantial.

Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.